Shirley Johnson v. Commissioner.
Johnson v. Commissioner
Docket No. 410-71.
United States Tax Court
T.C. Memo 1972-180; 1972 Tax Ct. Memo LEXIS 76; 31 T.C.M. (CCH) 884; T.C.M. (RIA) 72180; August 21, 1972
Samuel J. Foosaner, Suite 2240, 11 Commerce St., Newark, N.J., for the petitioner. Frank J. Smith, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency of $42,801.78 in petitioner's Federal income tax for the year 1966. We must decide whether the amount of $75,000 received in 1966 by petitioner, a licensed practical nurse, from an elderly friend and patient should be treated as a gift or as compensation for services. Findings of Fact Certain facts *77 have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference. The petitioner Shirley Johnson was a legal resident of Orange, New Jersey, when she filed her petition in this proceeding. Her individual Federal income tax return for the year 1966 was filed with the district director of internal revenue at Newark, New Jersey. Petitioner is a self-employed licensed practical nurse who during 1964 worked from a nurses registry. As such, she was employed in March 1964 to care for Miss 885 Cecile Kandel, who was then recovering from an operation performed at the Medical Arts Hospital in New York City. While petitioner attended Miss Kandel in the hospital she was paid between $150 and $189 per week based upon a 12-hour working day. [1]
Miss Kandel, an elderly woman, felt she required continued nursing care upon her release from the hospital. She offered the petitioner the position as her private nurse at that time. The petitioner was to be paid at the rate of $250 per week for *78 a 12-hour day. This was subsequently raised to $302 per week when the petitioner, who had been working evenings at another nursing job, terminated her other employment in order to devote full time and attention to Miss Kandel and her needs. For approximately 30 years Miss Kandel maintained a checking account at the Chase Manhattan Bank, Grand Central Branch, located at 422 Lexington Avenue, New York City. For at least 15 years she maintained brokerage accounts with Merrill Lynch, Pierce, Fenner and Smith and another company. Because of her advancing age Miss Kandel's signature grew less sure. Her bank deemed it advisable that she execute another signature card so that her checks would continue to be paid. She complied with the bank's request. During the time the petitioner cared for Miss Kandel they made occasional trips together from New York to the petitioner's home in New Jersey for visits with the petitioner's family. In December 1965 Miss Kandel gave the petitioner a check for $75,000. The Chase Manhattan Bank refused to cash it. Miss Kandel then called the bank to find out why her check was not paid upon presentment. She was told that the signature was irregular. To this *79 Miss Kandel replied that she would like to write another check and requested the bank to send someone over to witness her signature. A bank officer sent the head teller and another teller to Miss Kandel's apartment where, on January 10, 1966, they witnessed the execution of another check for $75,000 made payable to the petitioner. In addition to writing and signing the check in their presence, Miss Kandel write the word "gift" on the back of the check. At the same time she expressed her love and affection for petitioner and told the bank employees of her desire to give petitioner the money. Upon presentment the bank did not honor this second check. Payment was stopped by Miss Kandel's nephew, Nases. On January 20, 1966, Nases Kandel obtained an Order to Show Cause from the Supreme Court of New York County. This order was in response to a petition filed by the nephew seeking to have his aunt declared incompetent and himself appointed committee of her person and property. The petition was filed and the order obtained after the refusal of the Chase Manhattan Bank to honor the check. Pending the hearing and determination of the matter, the Chase Manhattan Bank was enjoined and restrained *80 from cashing any checks drawn by Miss Kandel on any of her accounts. The petitioner was likewise enjoined during the pendency of the hearing from seeking to negotiate the check given to her by Miss Kandel. The Order to Show Cause obtained by Nases Kandel also enjoined his aunt from "disposing of any of her monies or property without adequate consideration, and she be further restrained from making any gifts." During the protracted competency proceedings, which lasted from January 20, 1966, until July 7, 1966, Miss Kandel lived with the petitioner and her mother in East Orange, New Jersey. They had moved during the Christmas season of 1965, although it was in Manhattan that Miss Kandel wrote the January 10, 1966, check. Following physical and mental examinations, Miss Kandel was found, after trial before a jury from June 20 through 24, 1966, to be mentally competent and legally capable of managing her property in conformance with her own wishes. On July 7, 1966, the Supreme Court of New York County entered a judgment in favor of Miss Kandel. She was declared competent. On the next day, July 8, 1966, Miss Kandel reiterated in writing her desire to give the petitioner the $75,000 *81 as a gift because of her love and affection. The check of January 10, 1966, was later cashed and the petitioner received the proceeds. Miss Kandel's decision to give $75,000 to the petitioner evoked adverse comment from her broker at Merrill Lynch. He 886 strongly advised her against giving her money away. In spite of his repeated urging, Miss Kandel instructed him to sell certain securities for her account. Following the Court's judgment of July 7, 1966, which found Miss Kandel to be competent, the broker executed her order. The proceeds from the sales of the securities were well over $50,000 and were deposited in Miss Kandel's bank account. The broker estimated that the value of Miss Kandel's stockholdings handled by him in January 1966 was approximately $70,000 to $80,000. During the competency proceedings involving Miss Kandel the petitioner executed an affidavit setting forth various items of expense incurred by her in caring for Miss Kandel, none of which had been reimbursed because Miss Kandel's bank accounts had been frozen by court order during such period. In a letter attached to the affidavit the petitioner's attorney, Daniel G. Kasen, requested reimbursement of *82 these out-of-pocket expenses as well as salary due the petitioner. The attorney's letter also referred to an "agreement" whereby the petitioner would, in exchange for $75,000, take care of Miss Kandel for the rest of her life. Petitioner denied the existence of any such "agreement" and disavowed any knowledge of the contents of the letter. The letter was addressed by her attorney to the Guardian Ad Litem appointed for Miss Kandel. After the adjudication of the case the petitioner received her back wages. No further moneys were received by petitioner after July 1966 because most of Miss Kandel's remaining assets were expended in defending herself in the competency proceedings instituted by her nephew. From March 1964 until August 28, 1968, the date of Miss Kandel's death, the petitioner cared for her either at Miss Kandel's apartment in New York or at the petitioner's home in New Jersey. There is no evidence that Miss Kandel ever filed a Federal gift tax return. In his notice of deficiency dated December 22, 1970, respondent determined that the petitioner received additional income of $75,000 from Cecile Kandel in 1966. Ultimate Findings 1. Cecile Kandel intended to make *83 a gift of the $75,000 to the petitioner. 2. The amount of $75,000 was a gift excludable from petitioner's gross income in 1966 and did not constitute compensation for services. Opinion Whether the payment made to petitioner is a gift excludable from gross income under section 102(a), Internal Revenue Code of 1954, or taxable income under section 61(a), is basically a factual question to be resolved by the trier of the facts. Commissioner v. Duberstein, 363 U.S. 278, 289 (1960); Smith v. Commissioner, 305 F. 2d 778, 780 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court. The applicable principles were expressed by the Supreme Court in the Duberstein case (363 U.S. at 285-286) in the following manner: The course of decision here makes it plain that the statute does not use the term "gift" in the common-law sense, but in a more colloquial sense. This Court has indicated that a voluntary executed transfer of his property by one to another, without any consideration or compensation therefor, though a common-law gift, is not necessarily a "gift" within the meaning of the statute. For the Court has shown that *84 the mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. Old Colony Trust Co. v. Commisstoner, 279 U.S. 716, 730. And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit" of an economic nature, Bogardus v. Commissioner, 302 U.S. 34, 41, it is not a gift. And, conversely "[where] the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it." Robertson v. United States, 343 U.S. 711, 714. A gift, in the statutory sense, on the other hand, proceeds from a "detached and disinterested generosity," Commissioner v. LoBue, 351 U.S. 243, 246; "out of affection, respect, admiration, charity or like impulses," Robertson v. United States, supra at 714. And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's "intention." Bogardus v. Commissioner, 302 U.S. 34, 43. "What controls is the intention with which payment, however voluntary, has been made. *85 " Id., at 45 (dissenting opinion). [Footnotes omitted.] [Emphasis supplied.] The petitioner has the burden of proving that what she received was a gift and not compensation. Frank v. United States887 260 F. Supp. 691 (D.C.S.D. N. Y. 1966), and the cases cited therein. We think she has met that burden by a preponderance of the credible evidence contained in this record. Here, where the most "critical consideration" is the transferor's intention, the transferor (Cecile Kandel) was unable to testify and the respondent produced no witnesses. Therefore, we must divine the transferor's intent by drawing from the stipulation of facts, the various exhibits, the testimony of petitioner, the stockbroker and the two bank employees, and our experience with "the mainsprings of human conduct." In Webber v. Commissioner, 219 F. 2d 834, 835 (C.A. 10, 1955), the Court of Appeals said: The determination of the taxable nature of the monies received depends largely on the real intent of the parties, especially the payor, as shown by the peculiar facts and circumstances surrounding the payments in question. See also Thomas L. Johnson, 48 T.C. 636, 639 (1967); *86 Lillian Pascarelli, 55 T.C. 1082, 1090 (1971). As reflected in our ultimate findings, which are dispositive of this factual issue, we have concluded that Cecile Kandel intended to, and did, make a gift of $75,000 to the petitioner. The petitioner impressed us as a candid and truthful witness and as a gentle and considerate person who was genuinely fond of Miss Kandel. Her testimony is fortified by that of the two bank employees who indicated Miss Kandel's competency and intention at the time she signed the second check. Her testimony is likewise supported by the forthright statements of the stock-broker. The scenario is indeed appealing. It pulls at the heartstring. It depicts an elderly lady recovering from an operation yet fully in command of her mental faculties. She is befriended by a kindly and dedicated nurse. A strong bond of attachment and affection developed between them. An apparently greedy nephew was out to get his aged aunt's money. She resisted and was determined to give most of it to the petitioner - her devoted friend and companion. Her nephew tried to take her property through proceedings to have her declared an incompetent and to prevent her from *87 making a gift of money to her beloved Shirley - or "Anna" as she frequently called her because she reminded Miss Kandel of her deceased sister. She fought hard in the competency proceedings. She won and she was able to do with the money as she wished. Again she chose to give it to the petitioner. There is no evidence of undue influence. There is no question as to the validity of Miss Kandel's signature on the checks and various documents. The transfer stemmed from a "detached and disinterested generosity" engendered by the feeling and concern shown by the petitioner to Miss Kandel. Faced with the actions of her nephew and designing in the twilight of her life to express her love, gratitude, admiration and respect for the one person who cared for her the most, Cecile Kandel made a $75,000 gift to the petitioner. In these circumstances it is our firm conviction that such was her intent. We are not particularly concerned about respondent's point that Miss Kandel did not file a gift tax return. No doubt she was unaware of her obligation to do so. Nor are we persuaded by respondent's argument pertaining to the letter of the petitioner's attorney in the competency proceedings which made *88 reference to an "agreement" whereby the petitioner would, in exchange for $75,000, provide future care for Miss Kandel. The petitioner denied the existence of any "agreement" and the contents of the letter were disavowed. We believe the petitioner. It is our view that the letter did not accurately reflect the intention of either the petitioner or Miss Kandel, but was written out of a surfeit of caution by her attorney at the time. As to this the petitioner testified under questioning by the Court as follows: THE COURT: Was there ever any agreement? THE WITNESS: We didn't have an agreement, he just prepared it in this manner. I guess this is the way he presented it. I never said to him this was an agreement. THE COURT: Did you ever tell him there was an agreement - there was an agreement - THE WITNESS: No, I never made a statement. THE COURT: - that you would perform services for her in the future for the $75,000? THE WITNESS: No, I never said that at all. THE COURT: Was there ever anything in writing, any written agreement? THE WITNESS: No. 888 THE COURT: Was there ever any verbal agreement? THE WITNESS: No. Miss Kandel always contended that she gave me this *89 gift because of her love and affection, and that's the way she always referred to it. All things considered, we hold that the payment of the $75,000 to the petitioner was a gift which was properly excluded from her gross income. Decision will be entered for the petitioner. Footnotes
1. Although the parties stipulated the rate of pay to be $189 per week, petitioner's testimony was that she was paid $150 per week.↩