T. C. Memo. 2016-74

UNITED STATES TAX COURT

ANGELINA ALHADI, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17696-10.                     Filed April 21, 2016.

Angelina Alhadi, pro se.

<u>Jon D. Feldhammer</u>, <u>Thomas R. Thomas</u>, <u>Patricia Donahue</u>, and <u>Trent D. Usitalo</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Arthur Marsh worked hard and lived simply for decades, but when he became old and infirm he met Angelina Alhadi.  In the two last years of his life, she somehow came to receive more than a million dollars from him.

[*2] She claims that these transfers were nontaxable loans or gifts.  The Commissioner says they were the proceeds of undue influence and elder abuse.

He wants her to pay tax on it.  And he wants a fraud penalty too.

FINDINGS OF FACT

Arthur Marsh

Art Marsh was born in Montana a century ago, in late December 1915.  His parents weren't too far removed from the first homesteaders, and he grew up on their farm in Plentywood as the fifth of seven children.  His mother worked all day to do the laundry and prepare meals for her family, while his father tended to the land.  Neither had much education, and their lives were recorded only in the short and simple annals of the poor.  Many decades later he recalled that there hadn't been much room for tenderness.  He never once heard his father tell his mother that he loved her, and he never once saw his parents show affection to each other.  Art's education was cut short by the Depression, and it seemed he could look forward to the same hardscrabble life.

Then the war came.  After Pearl Harbor, Arthur Marsh volunteered and became an enlisted man.  He served the country honorably in a stateside posting, and after he was discharged he used his GI benefits to get a higher education.

**[*3]**   Dr. Arthur Marsh moved to California.  It was the Golden State's golden age.  The City of Gilroy--the small town where he settled after the war--boomed with its state, doubling in size and then doubling again and doubling once more.  Dr. Marsh opened an optometry practice there; and as Gilroy prospered and its middle class grew, he saw to the vision of three generations of families.

Dr. Marsh also set down deep roots in his town.  He joined civic associations like the Rotary Club, grew thick connections in his profession, and was a faithful member of his local church.  He loved the outdoors and would often take vacations throughout the West with his brothers and sisters and nieces and nephews.  But he never married or had children of his own, and when he returned home, it was always to the same second-floor apartment on Carmel Street.  It was only about 800 square feet, and Dr. Marsh furnished it modestly--a small table with a single chair on the right when one walked in, a living room connected to a kitchenette, and a single bedroom and bath.  Dr. Marsh was by no means a miser, but the poverty of his childhood and youth had--as it did to so many of his generation--marked him for life and made him frugal.  He rented his little apartment for $175 a month and got by largely on Social Security.  But Dr. Marsh had been a good businessman, saving over $1 million before he retired in the '80s and investing it prudently well into retirement until it reached nearly $3 million.

**[*4]** His friends sometimes joshed him about his habits, but he would just tell them that his wealth was insurance against having to leave his apartment of 50 years to end up in a nursing home.

But the silent artillery of time began to bracket him--his brothers and sisters died one after the other. Then, at the start of the new century, it hit him too. In 2000 he had a terrible fall and broke his hip, which sent him to the hospital and rehab. He began to use a walker and could not leave his second-story apartment without help. In 2007, when he was 91, things grew still worse. He couldn't drive a car, he couldn't go to the doctor, and he could no longer even prepare his own food. He suffered from incontinence, atrial fibrillation, congestive heart failure, hypertension, chronic back pain, arthritis, hearing loss in both ears, and deteriorating vision; then he suffered a stroke in the right frontal lobe of his brain.[1]

His physician, Dr. George Green, diagnosed him with dementia and cognitive decline. These neurological problems showed themselves in Dr. Marsh's poor short-term memory, diminished long-term memory, inability to perform simple arithmetic, and persistent deficiencies in visuospatial analysis. These problems also made him vulnerable--it had become difficult for him to

---

[1] According to Dr. Jonathan Mueller, the neuropsychiatric specialist who examined Dr. Marsh, this is the part of the brain associated with reflective self-awareness and insight.

[*5] remember any information about his assets.  Tests showed that he couldn't repeat five digits in sequence--let alone manage, analyze, or protect his seven-figure wealth.  In January 2007 Dr. Marsh was admitted to St. Louise Regional Hospital for dehydration.  His doctor knew he lived alone, knew he had no immediate family, and knew that his room was on the second floor.  Even as he recovered a bit in the hospital, Dr. Marsh was told he couldn't go back without first arranging for in-home care.

Ms. Angelina Alhadi

Enter Ms. Angelina Alhadi.  Ms. Alhadi is a native of the Philippines.  She had immigrated in the '80s and told Dr. Marsh that she was born into a poor family and spent many years working in rice paddies.  She claimed to have a bachelor's degree in medical technology in her native country.  She found work here as a nurse's assistant, which is what she did first at St. Louise Hospital in 1998 and then at a nursing home called Covenant Care in 2003.  When she wasn't working these two jobs she lived in a house in Hollister, California, that she coowned with her estranged husband and fellow immigrant, Yahya Hassan Alhadi.  They had three children.

St. Louise knows the elderly can be vulnerable, and it has a written policy that bans its employees from soliciting work from patients.  But never mind--Ms.

**[\*6]** Alhadi slipped a note to Dr. Marsh when she heard that he wouldn't be discharged without some in-home care ready for him.

Dr. Marsh accepted her offer, and she became his primary caregiver at the beginning of 2007. As part of her employment, Ms. Alhadi was supposed to prepare his meals, bathe him, make sure he took his drugs, provide basic nursing, shop for groceries, do his banking, drive him wherever he needed to go, help him to and from the bathroom, wash his clothes, clean his apartment, and provide some companionship for what had become a lonely old age.

Dr. Marsh hired Ms. Alhadi at an hourly rate, and she deposited her first paycheck from him in January 2007. She was paid according to their initial hourly arrangement through March. But then he agreed to pay her $6,000 a month for her services--even though the going rate was $3,750. He also gave her $1,000 a month for groceries--even though he needed only $400 a month to feed himself, and his minifridge could hold only about $50 worth of food. Ms. Alhadi began making deposit after deposit of cash into her bank account. Dr. Marsh's payments to Ms. Alhadi became irregular. On April 14 he wrote a check to her for $11,100; two days later he wrote her another for $100,000. He also bought her expensive electronic equipment.

**[*7]** Ms. Alhadi's lifestyle began to improve. In June 2007 she used money from Dr. Marsh to make a downpayment on a million-dollar home in Gilroy. After that, she began to pressure Dr. Marsh to help her with her mortgage payments. By the end of November 2007, he had written checks to her that added up to roughly $400,000--which she used to pay off her husband's $80,000 interest in their old home in Hollister and to remodel her new home in Gilroy. She spent $7,000 on furniture (purchased by Dr. Marsh for her); $8,000 on a new stone facade; $34,000 on landscaping work; and $73,000 on a new pool complete with a spa and a "therapeutic turtle mosaic."

This new pool almost became a problem for her. She told Dr. Marsh about her plans for it before work began. He said he didn't see how it made sense for her to build a pool until she had her house paid off. She ignored him. Then one day she presented Dr. Marsh with the $22,000 invoice for digging the hole for the pool. He roused himself to ask her: "Who the hell is going to pay for it?" She gave him a look as if to say: "Like who the hell do you think? I expect you to pay for it." Dr. Marsh then relented and later said that he felt he had to pay for the pool because the work was already done and he had to accommodate his caregiver.

Sometime that summer Ms. Alhadi told Dr. Marsh that she had won a cruise and that she wanted him to come with her. This was a ploy--she hadn't won

**[*8]** anything, and he was afraid he'd be all alone at home without any assistance when she went. Dr. Marsh paid $25,000 for the whole thing. But though she took him along, Ms. Alhadi left him sitting alone in the sun while she went off with her own children. Later, he couldn't remember paying for the cruise and was surprised when he was shown the check he had written.

Dr. Marsh wasn't yet wholly isolated. He'd always been particularly close to one niece, Sheila Person. But Ms. Person lived in Seattle and had her own life there. As her uncle grew old, however, she made it a habit to call him every Sunday night to check in. After Ms. Alhadi entered his life, her success in reaching him became sporadic. By 2008 Ms. Person found it even more difficult to get in touch. Ms. Alhadi would answer the phone and tell her that her uncle was asleep or eating, and sometimes the phone would just ring and ring with no answer. By the end of the summer of 2008, neither Ms. Person nor Dr. Marsh's other family members were able to get through Ms. Alhadi to talk to Dr. Marsh at all.

Ms. Alhadi wed isolation to expressions of affection. She told Dr. Marsh four or five times a day that she loved him. She suggested getting married and invited him to come live with her. She would sit in front of him and cry about

[*9] how she was financially struggling and worried about how she was going to survive and provide for her children.

We cannot find these tears genuine, for Ms. Alhadi was at the same time hiding her newfound fortune. In June 2007, as part of her divorce action, she signed and filed a property declaration under penalty of perjury in the Superior Court of California. In that declaration, she disclosed none of the money Dr. Marsh had paid her, even though she had received at least $150,000 by that point. In February 2008, as Ms. Alhadi's divorce action continued, she again filed with the court under penalty of perjury an income-and-expense declaration, in which she disclosed only the income she earned from St. Louise and Covenant Care.

A month later she went to Margarita Lopez, a tax preparer, to complete her 2007 return. She handed Ms. Lopez a handwritten list of her income and expenses; and when asked if she had any additional income, Ms. Alhadi said no. She never once mentioned Dr. Marsh or the money that she had wheedled from him.

We don't think this was forgetfulness. The Commissioner introduced into evidence the mortgage applications that Ms. Alhadi filled out to get two mortgages on her new million-dollar home. On *these* forms, Ms. Alhadi told the bank that

[*10] she earned $15,000 a month--$7,500 from her jobs at St. Louise and Covenant Care and $7,500 from her "second job" with Dr. Marsh.

Yet even this was only a fraction of what he was actually paying her. By the fall of 2008 Dr. Marsh had written checks to Ms. Alhadi that totaled nearly $800,000. Then Ms. Alhadi pressed down even harder. In October she got Dr. Marsh to write her five checks, each for $100,000. And then she wrote to her mortgage company that she didn't have enough money to make her mortgage payments and wanted her payments reduced.

Here begins the end of the story. One sometimes hears mockery of the modern mantra that "your call may be monitored for quality-control purposes," but Dr. Marsh had his wealth mostly in mutual funds with the Vanguard Group. Vanguard records all of its phone calls. The Commissioner introduced these recordings, and we were able to hear Dr. Marsh in his own voice. On one recording that October, the Vanguard representative identified herself and expressed concern that a fund owner had written five $100,000 checks in such a short time. She began to ask Dr. Marsh how he had come to write them. We heard Ms. Alhadi's voice in the background, and we heard her tell Dr. Marsh to repeat his Social Security number and we heard her read to the Vanguard representative the account balances in his money-market fund. In one call we

**[*11]** heard her explain to Vanguard on what days and exactly how many shares Dr. Marsh had sold from his accounts. In another call only thirty minutes later, we heard her in the background as she told Dr. Marsh that he needed to tell Vanguard that he wants to sell stock. Ms. Alhadi, however, testified that she knew nothing about Dr. Marsh's finances.

We don't believe her.

The next day, Vanguard's fraud team called Dr. Marsh to verify that he had authorized the five $100,000 checks to Ms. Alhadi. During this call we heard Ms. Alhadi yell in the background at Dr. Marsh, "reminding" him that he had written her five checks for $100,000, and Dr. Marsh replied: "I didn't think they were all a hundred thousand dollars". Throughout the rest of the phone call, Dr. Marsh got confused and stated: "I wrote one check, ten grand?" At various points we heard Ms. Alhadi threaten that he was going to get her in trouble if he didn't confirm that he had written her the checks.

Vanguard didn't honor the checks. It suspended his access to his accounts and sent him a letter to explain the steps he needed to take to regain control. Remember, though, that Dr. Marsh was homebound. He depended on Ms. Alhadi to get his mail, and she made sure he didn't. On one occasion, she told the FedEx deliveryman that Dr. Marsh no longer lived there. On another, she said that he

[*12] wasn't home. Lies, all lies--Dr. Marsh couldn't leave his apartment without her help.

The people at Vanguard now knew something was seriously wrong, and they sent a report of suspected elder abuse to the California Department of Health and Human Services in November 2008. The Department assigned Susan Fowle to investigate Vanguard's report. She is part of the Financial Abuse Specialist Team that investigates elder-abuse referrals for the Santa Clara County Public Guardian's Office. Investigator Fowle--whom we find to be an entirely credible witness--went to visit Dr. Marsh with two other members of her team and interviewed him for two hours. When she asked him about the money he was paying to Ms. Alhadi, he was so adamant that he hadn't written five $100,000 checks that Investigator Fowle had to call Vanguard again after the interview to make sure it was true. That was when she learned he had written a lot more than just five.

Ms. Alhadi made a last lunge for Dr. Marsh's money. She took him to see an estate attorney, James Simoni, in November 2008 to have Dr. Marsh grant her a power of attorney. Mr. Simoni, whom we also find a credible witness, testified that he learned about the blocked Vanguard accounts and supposed promise by Dr. Marsh to Ms. Alhadi to pay her approximately $300,000 in exchange for taking

**[*13]** care of him for the rest of his life. We find that this trip to his office was a ploy by Ms. Alhadi to get those accounts unblocked and to get her hands on the last few $100,000 checks that Dr. Marsh had written. Dr. Marsh later told Mr. Simoni that Ms. Alhadi was pressuring him to get named in his will, and that he needed to create a separate trust for her so that his family members wouldn't be able to interfere. Mr. Simoni refused to be part of this, and even tried to convince Ms. Alhadi to return the money she had already received. She told him: "Why should I, he gave it to me."

Ms. Alhadi's scheme soon unraveled. The Santa Clara Public Guardian filed a petition in state court to put Dr. Marsh under a temporary conservatorship. The court granted the petition in January 2009 on two grounds. The first was that Dr. Marsh's assets were at risk--he had written Ms. Alhadi nearly $1 million in checks and then wrote her another five $100,000 checks in October 2008.

The second, and even more devastating ground, was that Ms. Alhadi wasn't providing even a bare minimum of care. Ms. Fowle--and we note again that we found her testimony entirely credible--looked in Dr. Marsh's kitchen.

> The appliances were old, the sink was old, the cabinets were old, but on top of being old they were not clean. He had two little like dorm-size refrigerators, and one was on the floor, and it was a freezer, and the other--I assume it was a freezer because there was ice, it was overfrosted, and there was ice coming out of the door, and it couldn't

[*14] shut, and there was a trail of ants, and the food that was in this
freezer that was on the floor was rotten.

She saw greasy pots and pans, broken utensils and nothing but stale food "and just

sparse things."

She looked into his bedroom and:

whatever was in the drawers, everything that was close to the front was
stained with urine that he had spilled down it because he would either
maybe try to get to the bathroom and not make it and then use the urinal that
he had resting on his dresser and nobody had ever bothered to clean this.

She looked in the bathroom and found it:

really filthy . . . .  We pulled up the bath mat because it was older and
I wanted to get a new one I thought, you know, just to get the
bathroom cleaned up.  Underneath it, there was gelled mold all under
this bath mat, which told me that nobody was also cleaning the
bathroom.

Investigator Fowle also came across some papers.  Ms. Alhadi had

handwritten a document for Dr. Marsh to sign.  The document is in broken

English, written entirely in Ms. Alhadi's handwriting, and purports to make "any

amount of money given to her as a gift or loan will be void and cancelled after his

death."[2]  The document goes on to say that "I, Arthur Marsh made this decision in

---

[2] We are convinced that this awkward phrasing wasn't an effort to undo any
of the "gifts" Dr. Marsh had given her but instead an attempt to insulate her from
any effort to recoup the money she had received.

[*15] repayment for Angelina Alhadi her excellent care for me for take good care of him every day."

On February 13, 2009, Dr. Marsh died at the age of 93. His niece, Ms. Person, described the scene at his funeral mass: Ms. Alhadi, dressed in full hijab and carrying a single red rose, tried "to crawl in the coffin or get inside there and she was screaming."

This was the last contact Ms. Alhadi had with Dr. Marsh.

In August 2010 the Arthur J. Marsh Trust (Marsh Trust), which Dr. Marsh had created years before as a substitute for a will, settled a suit it brought against Ms. Alhadi. The trust recovered assets and $310,000 in cash. Ms. Alhadi's million-dollar home with its pool that Dr. Marsh had paid for was lost to foreclosure. Ms. Alhadi spent almost all the rest of the money or gave it away or rendered it untraceable.

On behalf of the Marsh Trust, Santa Clara County filed Forms 1099 for Ms. Alhadi covering 2007 and 2008. Ms. Alhadi didn't bring them to her annual meeting with Ms. Lopez, and the preparer didn't include the income that they reported on her returns. The IRS noticed, and wrote Ms. Alhadi to point out her failure. Ms. Alhadi took this letter back to Ms. Lopez, who warned Ms. Alhadi that she should file an amended return to include this unreported income. Ms.

[*16] Alhadi refused.  Revenue Agent Dan Sutherland later sent a letter to Ms. Alhadi to try to schedule an appointment, but she called back and said she'd hired an attorney.  She refused at that time, however, to provide any information about this lawyer--not even his name.  She never did provide Agent Sutherland with anything, and she failed to cooperate with the examination.

The Commissioner mailed Ms. Alhadi a notice of deficiency in which he asserted deficiencies and penalties on what he determined was a total unreported income of more than $1 million.[3]  We tried the case in San Francisco, and Ms. Alhadi was a California resident when she filed her petition.

---

[3]  Remember that this is just the unreported income and not the total Ms. Alhadi got from Dr. Marsh.  The Commissioner humanely decided before trial not to include in these totals the $310,000 that was in Ms. Alhadi's account and thus probably subject to her dominion and control.  See Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).  The effect is that this remaining money from Dr. Marsh's lifetime of hard work and thrift will pass to his beneficiaries and not be taken by the IRS to pay Ms. Alhadi's substantial tax bill.  See Barbara K. Morgan, "Should the Sovereign be Paid First?  A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy," 74 Am. Bankr. L.J. 461, 463 (2000).

**[\*17]** <span style="margin-left:40%">OPINION</span>

What are the tax consequences of this behavior?

A.     Failure To Report Income

We generally presume that the Commissioner's determinations in a notice of deficiency are correct, and the taxpayer bears the burden of proving otherwise. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). For cases appealable to the Ninth Circuit, there is an additional quirk in unreported-income cases: The presumption of correctness doesn't attach unless the Commissioner first establishes an evidentiary foundation that links the taxpayer to the alleged income-producing activity. See Weimerskirch v. Commissioner, 596 F.2d 358, 360-62 (9th Cir. 1979), rev'g 67 T.C. 672 (1977). We don't need much evidence, and what evidence we have needn't be direct. See Grandy v. Commissioner, T.C. Memo. 2012-196; Banister v. Commissioner, T.C. Memo. 2008-201, aff'd, 418 F. App'x 637 (9th Cir. 2011). But this special rule is a low hurdle here. The Commissioner introduced bank and credit-card records that show Ms. Alhadi received at least $900,000 during the years 2007 and 2008 that she failed to report on her tax returns. Ms. Alhadi doesn't deny receiving this money from Dr. Marsh. Instead, she argues we should exclude it from her gross income because it was a loan or gift from Dr. Marsh. We find that the Commissioner has met his burden

[*18] here, and the burden of proof is on Ms. Alhadi to show she didn't have to include these transfers in her taxable income for her 2007 and 2008 tax years.

B.     Character of the Income

1.     A loan?

In tax law, a loan is "an agreement, either express or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree." Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000) (quoting Commissioner v. Valley Morris Plan, 305 F.2d 610, 618 (9th Cir. 1962)), aff'g T.C. Memo. 1998-121. A *bona fide* loan is created when both parties intend to establish a debtor-creditor relationship at the time the funds are advanced. Fisher v. Commissioner, 54 T.C. 905, 909-10 (1970). And we decide whether a debtor-creditor relationship exists based on all the facts and circumstances in the case. Id. at 909. We focus on the time that the funds were transferred and ask whether there was "unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment." Haag v. Commissioner, 88 T.C. 604, 616 (1987), aff'd, 855 F.2d 855 (8th Cir. 1988).

**[*19]** We consider several factors. Sollberger v. Commissioner, 691 F.3d 1119 (9th Cir. 2012); In re Lane, 742 F.2d 1311 (11th Cir. 1984); see Calloway v. Commissioner, 135 T.C. 26, 37 (2010), aff'd, 691 F.2d 1315 (11th Cir. 2012); aff'g T.C. Memo. 2011-78.[4] We needn't run through all of them to find that Dr. Marsh lent no money to Ms. Alhadi. He never once referred to the money as anything other than compensation for taking care of him. He received no certificates evidencing indebtedness or schedules for repayment, and Ms. Alhadi shows no proof of any maturity dates, or interest rates set, or interest paid. The document that she prepared for him to sign, and that Ms. Fowle found, purports to forgive all "loans" after his death--further demonstrating that she never intended to give the money back. And while some checks had "loan" written in the memo

_____

[4] They are:
(1) the names given to the certificates evidencing the indebtedness;
(2) the presence or absence of a fixed maturity date;
(3) the source of payments;
(4) the right to enforce payment of principal and interest;
(5) participation in management flowing as a result;
(6) the status of the contribution in relation to regular corporate creditors;
(7) the intent of the parties;
(8) 'thin' or adequate capitalization;
(9) identity of interest between creditor and stockholder;
(10) source of interest payments;
(11) the ability of the corporation to obtain loans from outside lending institutions;
(12) the extent to which the advance was used to acquire capital assets; and
(13) the failure of the debtor to repay on the due date or to seek a postponement.

**[*20]** line, some checks had memo lines that read "gift" while others read "personal." We therefore find that Dr. Marsh and Ms. Alhadi weren't in a debtor-creditor relationship. We also specifically find that the $310,000 that the Marsh Trust managed to recover from Ms. Alhadi wasn't a repayment.

2.     A gift?

Ms. Alhadi argues in the alternative that the money she received from Dr. Marsh was a gift and so not income under section 102.[5] To be a gift, the transfer must proceed from a "detached and disinterested generosity * * * out of affection, respect, admiration, charity or like impulses." Commissioner v. Duberstein, 363 U.S. 278, 285 (1960) (internal quotations omitted). Where payment is for past services or an inducement for services in the future, it's not a gift, id. at 292, and it doesn't matter that the donor derived no economic benefit from it, Robertson, 343 U.S. at 714. A payment stemming from any obligation, whether moral or legal, is also not a gift. Bogardus v. Commissioner, 302 U.S. 34, 41 (1937). The most critical consideration is the transferor's intention or motive "with which payment, however voluntary, has been made." Duberstein, 363 U.S. at 286. We can glean insight into a transferor's intent by looking at the facts surrounding the transfer

---

[5] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule reference are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

**[*21]** and the form of assistance. United States v. Kaiser, 363 U.S. 299, 304 (1960). The donor's characterization of the payment isn't dispositive, however-- there must be "an objective inquiry as to whether what is called a gift amounts to it in reality." Duberstein, 363 U.S. at 286.

There is a strong presumption that payments made beyond an employee's salary are compensation for services and not gifts. See Van Dusen v. Commissioner, 166 F.2d 647 (9th Cir. 1948), aff'g, 8 T.C. 388 (1947); Botchford v. Commissioner, 81 F.2d 914, 916 (9th Cir. 1936), aff'g 29 B.T.A 656 (1933); Jackson v. Commissioner, 25 T.C. 1106, 1111 (1956); Walker v. Commissioner, 25 T.C. 832 (1956); Laurie v. Commissioner, 12 T.C. 86 (1949). Ms. Alhadi already admitted that she earned $37,300 and $72,000 for services she performed for Dr. Marsh in 2007 and 2008. We can therefore presume that the rest of the payments she received from Dr. Marsh weren't gifts, but rather compensation for services.

Nonfamily taxpayers in generous-elder cases who rely solely on their own testimony can succeed in proving that a transfer was a gift and not a misappropriation. See, e.g., Lebaron v. Commissioner, T.C. Memo. 1990-592 (holding that although the taxpayer failed to meet her burden, it was possible for a

[*22] taxpayer to prove). The issue is one of fact, however, and the burden of proof rests on Ms. Alhadi. See Rule 142(a).

We must decide whether what Ms. Alhadi calls a gift was intended as a gift by Dr. Marsh. See Duberstein, 363 U.S. at 286. Ms. Alhadi's entire case rests on her own uncorroborated testimony and the word "gift" written on the memo lines of some of the checks. We look at things objectively, and the first thing we see is that Dr. Marsh couldn't even keep track of how much money he had given to Ms. Alhadi. He told the neuropsychiatrist who examined him, Dr. Mueller: "In the first place, I didn't realize I gave her that much money." Mr. Simoni, Dr. Marsh's estate attorney, speculated that the arrangement between Dr. Marsh and Ms. Alhadi was perhaps a sort of viatical contract--that $300,000 was given to Ms. Alhadi as prepaid medical payments for caregiver services for the remainder of his life. (We do note that we believe Mr. Simoni's testimony that Dr. Marsh never once told him that he was giving his money to Ms. Alhadi as a gift). And while Dr. Marsh referred to the payments as compensation, he also said he was taken advantage of.

We have no difficulty, then, in finding that the transfers to Ms. Alhadi weren't gifts. But they also weren't embezzlement. So what were they? On this question, we agree with Dr. Mueller's expert testimony. He concluded that there

[*23] was a real, if sad, emotional bond between Dr. Marsh and Ms. Alhadi. He testified that Dr. Marsh wanted to rescue her, wanted to be a good person, and wanted to feel loved "for the rest of his days on earth." He observed that "there is no way that one could put a price tag on the depth of the pleasure and sense of security that he felt with this woman," as though he was the "luckiest man in the world."

Is this the "affection, respect, admiration, charity or like impulses" that Duberstein, 363 U.S. at 285, tells us to look for? The Commissioner argues that it isn't--that any donative intent there may have been was negated by the presence of undue influence. There is very little federal tax law about whether and how undue influence on a donor affects the validity of a gift for purposes of section 102. The only caselaw on point is readily distinguishable: In Johnson v. Commissioner, T.C. Memo. 1972-180, 31 T.C.M. (CCH) 884 (1972), the taxpayer was the in-home nurse practitioner charged with taking care of an elderly woman who was recovering from an operation. She quit her day job to work full time for the woman, eventually brought her to live with her own family, and was a devoted friend and companion. After a few years, and in the twilight of her own life, the elderly woman decided to give the nurse $75,000. The elderly woman's nephew then began a series of protracted competency proceedings to restrain his aunt from

[*24] giving anything to the loving nurse. The elderly woman fought back hard--she proved she was in control and knew what she was doing. And we found that she was mentally competent and capable of managing her property. We found that the nephew was out to get his aunt's money and that there was no question that the transfer to the nurse stemmed from a desire to "express her love, gratitude, admiration and respect for the one person who cared for her the most." We upheld the gift but were careful to point out that there was no evidence of undue influence.

If we squint hard enough, maybe we can make out some similarities--Dr. Marsh had a niece rather than a nephew looking in on him. But Ms. Person is the opposite of the "greedy" character in Johnson out to get his aunt's money and didn't even know how much money her uncle had. She didn't seek to place him under a conservatorship; the Santa Clara Public Guardian's Office did, after it independently determined that Ms. Alhadi was abusing him. That office succeeded because, unlike the elderly woman in Johnson, Dr. Marsh could not demonstrate that he was competent. His physician diagnosed him with dementia, and an independent neuropsychiatrist--the same Dr. Mueller whose testimony we heard at trial and found credible--determined that Dr. Marsh wasn't competent to handle his finances and was the victim of financial abuse.

**[*25]** And Ms. Alhadi wasn't the gentle and considerate caregiver that we saw in Johnson. We heard her on the recordings from Vanguard yelling at Dr. Marsh, cajoling him, and directing him to do as she said with his money. She was also not as candid and as truthful a witness as the caregiver in Johnson. Ms. Alhadi testified she knew nothing of Dr. Marsh's finances and had never seen his brokerage statements, but the Vanguard audiotape proved she knew about specific trades, which she read from his brokerage statement. And Ms. Person's and Mr. Simoni's credible testimony back up this physical record of Ms. Alhadi's true behavior. We believe them and not her.

That means that we now have to figure out the questions we left unanswered in Johnson: Just what is undue influence as a matter of federal tax law, and how does it affect donative intent? There are plenty of cases where we made common-sense findings that there can be no detached and disinterested generosity in the presence of coercion or undue influence. Altman v. Commissioner, 475 F.2d 876 (2d Cir. 1973) (no gift if transfer induced by threats), aff'g T.C. Memo. 1972-26; See Peters v. Commissioner, 51 T.C. 226, 231 (1968) (money obtained by impersonating cancer patient not gift); Thrower v. Commissioner, T.C. Memo. 1962-291, aff'd, 330 F.2d 614 (5th Cir. 1964) (subtle coercion on donor). But we think there is also a role for state law in these cases. State law creates property

**[\*26]** rights and interests, and federal law merely determines their tax treatment. Morgan v. Commissioner, 309 U.S. 78, 80 (1940); Pierre v. Commissioner, 133 T.C. 24, 29 (2009). Whether Ms. Alhadi obtained money from Dr. Marsh through undue influence affects her right to that money and is thus a question of state law. See Estate of Sharp v. Commissioner, T.C. Memo. 1994-636 (state law determines whether deed procured by undue influence).

California has codified its definition of undue influence as:

- the use of a confidence or (real or apparent) authority for the purpose of obtaining an unfair advantage over someone;

- taking an unfair advantage of another's weakness of mind; or

- taking a grossly oppressive and unfair advantage of another's necessities or distress.

Cal. Civ. Code sec. 1575 (West 1982). For the specific purpose of elder abuse, California law defines undue influence as the "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." Cal. Welf. & Inst. Code sec. 15610.70 (West 2014). The statute considers:

- the vulnerability of the victim;

- the influencer's apparent authority;

[*27] • the actions or tactics used by the influencer; for example the use of affection;

• the equity of the result.

Id. California takes elder abuse seriously, and provides statutory remedies to its victims. See, e.g., id. sec. 15657.5 (West 2012); id. sec. 15610.30 (West 2014); id. sec. 3294 (West 1997); id. sec. 3345.

We find that Ms. Alhadi exerted undue influence over Dr. Marsh. She was in a confidential relationship with Dr. Marsh as his sole caregiver. He relied on her just to get downstairs, to go to the doctor, to be fed, and even to bathe. Dr. Marsh was also in extremely poor health; he suffered from heart problems, hearing and vision loss, a broken hip, and dementia, among other handicaps. Ms. Alhadi knew all this. She used her relationship with Dr. Marsh to isolate him from his family and financial advisers and to wring money out of him. She repeatedly prevented Vanguard from contacting him by mail and would interfere when Ms. Person tried to talk with him on the phone. The resulting isolation and dependence made him even more vulnerable to Ms. Alhadi's influence.[6] His

---

[6] In the last few months of his life, Dr. Marsh told Dr. Mueller, the neuropsychiatrist, that it was "impossible to imagine how it feels being 90 years-old and feeling loved for the first time." Dr. Mueller, however, tested Dr. Marsh for depression and found it significant that Dr. Marsh agreed with statements such as "I feel sad much of the time," "I feel more discouraged about my future than I

(continued...)

[*28] multiple cognitive deficits also affected his ability to withstand this influence. He wasn't able to do simple computations, he had poor short-term and diminished long-term memory, and he could no longer understand (let alone analyze) his million-dollar portfolio.

Ms. Alhadi was a trained caregiver. Dr. Marsh's problems were obvious to anyone, but their consequences for his ability to make rational decisions would have been even more obvious to her. Dr. Marsh's spending on Ms. Alhadi was uncharacteristic of a man who had spent most of his life fearing the poverty in which he was born. Inspector Fowle concluded that this wild spending was so abnormal for Dr. Marsh that it was strong evidence that Ms. Alhadi had unduly influenced him. And Ms. Alhadi's unending demands on Dr. Marsh--that he pay for a swimming pool, cover her mortgage, name her in his will, create a separate trust for her benefit, and treat her and her family to a cruise--all support this finding.

We also can't close our eyes to Dr. Marsh's emotional life. Ms. Alhadi preyed on his loneliness. She would sit and cry in his apartment and lament how she had no money and didn't know how she was going to survive. She exploited

---

[6](...continued)
used to," "I don't consider myself as worthwhile and useful as I used to," and "I have lost most of my interest in other people or things."

[*29] his forgetfulness. Sometimes Dr. Marsh thought he was behind on paying her and she didn't correct him, even though he had actually never fallen behind. Like Dr. Mueller, we too were struck at the lack of any anger in Dr. Marsh as he flitted in and out of realizing what Ms. Alhadi had done. We agree with him as well, however, that Dr. Marsh's "lack of animus and his failure to experience any deep outrage or disgust at her behavior, do not exculpate her. They merely indicate that she chose her victim well."

We don't hold that all gifts to caregivers are made from undue influence; Johnson shows they aren't. But this case is different: It was Ms. Alhadi's job to keep Dr. Marsh's apartment clean, to supply him with fresh food, and to help maintain his dignity. She did not. We return to the testimony of Inspector Fowle:

Q: * * * [D]id you make a final determination as to whether Dr. Marsh was a victim of financial elder abuse?

A: Yes.

Q: And what was that determination?

A: That there was financial elder abuse . . . .

Q: And who was the perpetrator of the financial abuse?

A: Angelina Alhadi.

[*30] We find that Ms. Alhadi exercised undue influence on Dr. Marsh and that all the money she received from him is taxable to her.

## C.    Self-Employment Tax

The Commissioner also determined that Ms. Alhadi owes self-employment tax on the money she obtained through this undue influence. Self-employment income is income arising from the performance of personal services where an employer-employee relationship does not exist between the payor and the payee. Secs. 1401 and 1402. Section 1401 imposes a percentage tax on self-employment income of every individual. Self-employment income is defined as: "the net earnings from self-employment derived by an individual * * * during any taxable year." Sec. 1402(b). "Net earnings from self-employment" is defined as the gross income derived from any trade or business carried on by such individual, less deductions. Sec. 1402(a). The obligation to pay self-employment taxes is mandatory so long as the requirements of section 1401 are met. United States v. Lee, 455 U.S. 252 (1982). The agreement between Dr. Marsh and Ms. Alhadi included monthly wages of $6,000, totaling annual income of $72,000. At trial Ms. Alhadi admitted to making only $37,300 related to her services during 2007. There is no reason to believe that Ms. Alhadi received less than $72,000 of income related to her services in 2007. Dr. Marsh wrote her checks totaling $28,154

**[*31]** between January and April 2007 alone. Dr. Marsh consistently referred to all the money he gave Ms. Alhadi as payment in exchange for her services. Even if we find that the money Dr. Marsh paid Ms. Alhadi was misappropriated by Ms. Alhadi when she influenced him to make those payments, see *infra*, the funds would still be taxable income. See James v. Commissioner, 366 U.S. 213 (1961). Therefore, we hold that she is liable for self-employment tax.

D.  Fraudulent Return

The Commissioner also argues that Ms. Alhadi's 2007 and 2008 returns-- returns on which she failed to report the money she got from Dr. Marsh--were fraudulent, which would make her liable for a section 6663 penalty. The burden of showing fraud is on the Commissioner, and the burden is one that he must meet with clear and convincing evidence. The Commissioner must establish that Ms. Alhadi intentionally evaded a tax that she believed was due. See McGee v. Commissioner, 61 T.C. 249, 256 (1973), aff'd, 519 F.2d 1121 (5th Cir. 1975). He can meet this burden if he shows that there is an underpayment, and that some part of the underpayment was due to fraud. Secs. 6663(a), 7454(a); Rule 142(b).

The first part of the test is easily met, and we've already discussed it. Ms. Alhadi failed to report any income from Dr. Marsh. This income was substantial and caused a large underpayment of the tax that Ms. Alhadi owed.

[*32] But was this underpayment due to fraud? Fraud is the intentional wrongdoing on the part of the taxpayer with the specific purpose of evading tax believed to be owing. Petzoldt v. Commissioner, 92 T.C. 661, 698 (1989). Direct evidence of fraud is seldom available, Stone v. Commissioner, 56 T.C. 213, 223-24 (1971), but we may infer it from conduct calculated to mislead or conceal, Beaver v. Commissioner, 55 T.C. 85, 93 (1970). Our caselaw describes a number of factors that might indicate fraudulent intent:

- understating income;

- concealing income or assets;

- filing false documents;

- failing to cooperate with tax authorities;

- giving implausible or inconsistent explanations of behavior;

- illegal activity; and

- living a lavish lifestyle.

Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601.

Relying on these factors, the Commissioner easily showed that Ms. Alhadi's 2007 and 2008 returns were fraudulent.

[*33] *Understatement*.  Ms. Alhadi knew that the income she earned for her caregiving services was taxable.  Despite this, she reported none of the money Dr. Marsh paid her on her income tax return for either year.  She had undisclosed caretaker income of more than $1 million for her 2007 and 2008 tax years combined.

*Concealment*.  Ms. Alhadi actively worked to conceal the income.  She failed to tell her tax preparer that she worked for Dr. Marsh and that she received money from him.  After Santa Clara County sent Forms 1099 to her covering 2007 and 2008, her tax preparer advised her to amend her returns to reflect the additional income, which she refused to do.

*Filing false documents*.  When she applied for home mortgages to buy her new million-dollar home, Ms. Alhadi disclosed all of her regular monthly income from Dr. Marsh.  But Ms. Alhadi filed false reports of her assets and income with the Superior Court of California as part of the divorce proceedings against her. She signed these documents under penalty of perjury.

*Failure to cooperate*.  Ms. Alhadi actively concealed the income through the audit.  She didn't turn over any documents the examiner requested, and she refused to provide any information to the examiner.  She even refused at first to tell the auditor the name of her attorney.

[*34] *Inconsistent explanations*.  Ms. Alhadi's testimony teemed with perjury. She testified that she received payments from Dr. Marsh only by check.  After being confronted with the evidence of cash deposits at trial, and being unable to come up with any explanation for it, she changed her story and acknowledged that the cash came from Dr. Marsh.  She testified that she didn't know anything about his finances, but then the Commissioner's lawyer played the Vanguard audio files. She testified that Dr. Marsh offered to build her a pool, but Dr. Marsh in his videotaped interview from conservatorship proceedings told how Ms. Alhadi demanded he pay the bill for the pool after he had specifically counseled her against having it built.  Finally, while Ms. Alhadi didn't tell her tax preparer that she worked for Dr. Marsh at the time she prepared her returns, she did tell her that she had incurred car-and-truck expenses traveling between St. Louise Hospital and Carmel Street, in Gilroy, California--Dr. Marsh's apartment.  Ms. Alhadi deducted these expenses as Schedule A unreimbursed-employee business expenses on her 2007 and 2008 returns.

*Illegal activity*.  Ms. Alhadi's inducing Dr. Marsh to pay her large sums of money through the use of undue influence amounted to "abuse of an elder," which includes both financial abuse and isolation of an elder, in violation of the California Welfare and Institutions Code section 15610.07 (West 2014).  Financial

**[*35]** abuse is defined under the California Welfare and Institutions Code section 15610.30 as occurring when a person "[t]akes, secretes, appropriates, obtains, or retains * * * real or personal property of an elder or dependent adult by undue influence." We've already found that Ms. Alhadi did this. Isolation of an elder includes "acts intentionally committed for the purpose of preventing, and that do serve to prevent, an elder or dependent adult from receiving his or her mail or telephone calls." Id. sec. 15610.43(a)(1). Isolation also includes "telling a caller or prospective visitor that an elder or dependent adult is not present, or does not wish to talk with the caller * * * where the statement is false * * * is contrary to the express wishes of the elder * * * and is made for the purpose of preventing the elder or dependent adult from having contact with family, friends, or concerned persons." Id. para. (2). Ms. Alhadi blocked phone calls to Dr. Marsh from his niece, told a FedEx delivery man that he no longer lived at his address, and blocked Vanguard's mail to him.

*Lavish lifestyle*. Ms. Alhadi bought a second home for $1 million in 2007, putting up a $100,000 downpayment. She spent another $115,000 on remodeling, bought her husband's interest in their Hollister home for $80,000, went on a fancy cruise, and had her home equipped with expensive furniture and electronics.

We find that Ms. Alhadi's 2007 and 2008 returns were fraudulent.

**[*36]**                                    <u>Conclusion</u>

It is unusual for so lopsided a case to go to trial.  Ms. Alhadi called no witnesses and introduced no exhibits.  In the face of credible testimony against her, documents in her own hand showing fraud, and even Dr. Marsh's recorded statement and calls in which we heard direct evidence of her abuse of this old man, she denied everything:

> [M]y heart is clean, and I don't expect anyone in this court to believe me.  You know, I don't have nobody to help me protect me in my case.  I know the people in this court is very strong.  But I feel myself that I'm clean.  In the face of God, I'm clean.

We are a court of mercifully limited jurisdiction, and must make no particular judgment about what is in her heart.  But we will enter a final decision against her in our Court that

- holds that undue influence can be found by applying the law of the state where it was exercised;

- finds that through undue influence as defined in California law she obtained $451,891.05 in 2007 and $474,983.22 in 2008 that she should have reported as income on her returns;

**[*37]** ● finds that her income from Dr. Marsh was self-employment income; and

● finds that her returns for those two years were fraudulent.

<u>Decision will be entered</u>

<u>under Rule 155</u>.