T.C. Memo. 2020-73

UNITED STATES TAX COURT

BURT KRONER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23983-14.                    Filed June 1, 2020.

<u>Barbara T. Kaplan</u>, <u>Scott E. Fink</u>, and <u>G. Michelle Ferreira</u>, for petitioner.

<u>Carina J. Campobasso</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  In a notice of deficiency dated July 10, 2014, respondent

determined income tax deficiencies for taxable years 2005, 2006, and 2007 of

$1,635,206, $5,765,384, and $1,821,277, respectively, and accuracy-related

[*2] penalties under section 6662[1] of $327,041, $1,153,077, and $364,255,

respectively. Respondent filed an amended answer to increase the deficiency and

accuracy-related penalty for 2006 to $5,821,198 and $1,164,239.60, respectively.

After concessions, the issues for decision are: (1) whether transfers of funds to

petitioner during the years at issue constitute gifts that petitioner properly

excluded from gross income under section 102 and (2) whether petitioner is liable

for accuracy-related penalties under section 6662.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of

facts is incorporated herein by this reference. Petitioner resided in Florida when

he timely petitioned this Court for redetermination of his tax liabilities for the

years at issue.

Throughout his career, petitioner has worked extensively in the discounted

cashflow industry. In the early 1990s, through his work, petitioner met and

developed a business relationship with David Haring. The business relationship

lasted until 2007 when petitioner repaid a loan that Mr. Haring, through an entity,

had made to fund petitioner's credit counseling business. Mr. Haring is a high-

---

[1]All section references are to the Internal Revenue Code (Code) in effect for the relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. Some monetary amounts are rounded.

[*3] net-worth British citizen, with residences and business interests in various non-U.S. jurisdictions.

I.      Petitioner's Entities and Trusts

In late 2003 and into 2004 petitioner sought legal advice from Robert Bernstein, an attorney who represented Mr. Haring, concerning asset protection. Mr. Bernstein recommended an offshore trust to hold petitioner's assets. On April 29, 2004, through Mr. Bernstein's firm, petitioner established the Kroner Family Trust in Nevis (Nevis trust). The beneficiaries of the Nevis trust were petitioner and his son. Petitioner transferred his closely held business interests to the trust, including his interest in the entity Private Capital Ventures (PCV).

By 2007 petitioner had acquired substantial liquid assets that he did not feel comfortable holding in the Nevis trust. On June 4, 2007, through Mr. Bernstein, the Kroner Family 2007 Trust Settlement B (Bahamas trust) was established at UBS in the Bahamas for the benefit of petitioner and his children. The Bahamas trust owned KFT Holdings II (KFT).

II.     Mr. Haring's Cash Transfers to Petitioner

During tax years 2005, 2006, and 2007 petitioner received wire transfers from Mr. Haring, or entities associated with Mr. Haring, in the aggregate amounts of $4,425,000, $15,350,000 and $5,000,000, respectively. The transfers were

[*4] coordinated by Mr. Haring's associate, Antony Mitchell. Petitioner or a related entity received the following transfers:

| Date | Recipient | Amount |
| --- | --- | --- |
| 2/4/2005 | Nevis Trust | $2,600,000 |
| 2/14/2005 | Petitioner | 700,000 |
| 2/25/2005 | Petitioner | 400,000 |
| 6/30/2005 | Nevis Trust | 475,000 |
| 8/15/2005 | Nevis Trust | 250,000 |
| 1/27/2006 | Nevis Trust | 600,000 |
| 4/20/2006 | Petitioner | 6,000,000 |
| 12/20/2006 | PCV | 8,750,000 |
| 7/16/2007 | KFT | 2,500,000 |
| 7/19/2007 | KFT | 2,500,000 |

III.   Petitioner's Tax Reporting and Notice of Deficiency

Mr. Bernstein advised petitioner that the transfers received from Mr. Haring were excludable from income under section 102. Mr. Bernstein provided this advice on the basis of: (1) a conversation with petitioner and (2) a note he and Mr. Mitchell had drafted for Mr. Haring, stating that the transfers were gifts.

Mr. Bernstein advised petitioner of the requirement to file Form 3520, Annual Return to Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts, for each year that petitioner received a transfer from Mr. Haring

[*5] into an account titled in his name. With respect to transfers routed to petitioner's trusts or related entities, however, Mr. Bernstein advised petitioner that no reporting was required.

Anthony DeQuino, a certified public accountant, prepared petitioner's Forms 1040, U.S. Individual Income Tax Return, for the years at issue. Mr. Bernstein prepared petitioner's Forms 3520 for the years at issue. Petitioner did not report any of the transfers from Mr. Haring as income during the years at issue.

Sometime after petitioner filed his 2005 through 2007 returns, the IRS selected those returns for examination. Starting in March 2011 Revenue Agent John C. Cox (RA Cox) conducted the examination of petitioner's returns. On August 6, 2012, RA Cox delivered Letter 915 and Form 4549, Income Tax Examination Changes, to petitioner's representatives during a closing conference. The Letter 915 and its attachments proposed accuracy-related penalties under section 6662 and provided petitioner with the opportunity to protest the proposed changes with the Appeals Office. It was not until October 31, 2012, that RA Cox's supervisor, Supervisory Revenue Agent Diane Acosta, signed Workpaper #300-1.1, titled Civil Penalty Approval Form. On that same day, RA Cox mailed to petitioner Letter 950, enclosing Form 4549-A, Income Tax Discrepancy Adjustments.

**[\*6]** Following that examination respondent mailed to petitioner a notice of deficiency dated July 10, 2014. In that notice respondent determined, inter alia, that Mr. Haring's transfers to petitioner should be included as income and that petitioner was liable for accuracy-related penalties under section 6662(a). Petitioner timely petitioned this Court for redetermination. On April 20, 2016, respondent filed an amended answer to increase the amounts of the deficiency and the accuracy-related penalty for taxable year 2006. The increase resulted from a correction to the transfer amount on December 20, 2006. Petitioner conceded at trial that the correct amount of the December 20, 2006, transfer was $8.75 million and not $8.6 million.

OPINION

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).[2] If, however, a taxpayer produces

---

[2]In a case appealable to the U.S. Court of Appeals for the Eleventh Circuit, as this one is absent a stipulation to the contrary, this presumption attaches only where there is a minimal "evidentiary foundation linking the taxpayer to the alleged income-producing activity." Blohm v. Commissioner, 994 F.2d 1542, 1549 (11th Cir. 1993) (quoting Weimerskirch v. Commissioner, 569 F.2d 358, 362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977)), aff'g T.C. Memo. 1991-636. Respondent has established this minimal evidentiary foundation, given that the parties do not dispute the amount or receipt of the funds at issue for any year but,

(continued...)

**[*7]** credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability for any tax imposed by subtitle A or B of the Code and satisfies the requirements of section 7491(a)(2),[3] the burden of proof on that factual issue shifts to the Commissioner.  Sec. 7491(a)(1).  Petitioner does not contend that section 7491(a) applies, nor has he introduced evidence to prove he meets the requirements of section 7491(a)(2).  The burden of proof remains on petitioner with respect to the deficiencies determined in the notice of deficiency.  Respondent, however, bears the burden of proof with respect to the increase in the deficiency for 2006, first asserted in his amended answer.  See Rule 142(a).  Because the parties do not dispute the receipt or amount of the funds relating to tax year 2006, respondent has met his burden of proof unless petitioner proves that these transfers, including the transfer in tax year 2006, were nontaxable gifts under section 102.  See Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).

---

[2](...continued)
rather, dispute only the proper characterization of those funds as taxable income or as nontaxable gifts.

[3]Sec. 7491(a)(2) requires a taxpayer to demonstrate that he or she (1) complied with the requirements under the Code to substantiate any item, (2) maintained all records required under the Code, and (3) cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews.  See Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).

**[*8]** I.        Gifts Under Section 102

Gross income is income from whatever source derived unless otherwise excluded.  Sec. 61(a).  Gross income, however, does not include the value of property acquired by gift.  Sec. 102(a).  The United States Supreme Court has defined a gift under section 102 as a transfer that proceeds from a detached and disinterested generosity, out of affection, respect, admiration, charity or like impulses.  Commissioner v. Duberstein, 363 U.S. 278, 285 (1960).  In so doing, the Supreme Court stated that the most important consideration in ascertaining whether a gift has been made is the intention of the donor.  Id.  The donor's characterization of his action is not determinative, however, and a court must make an objective inquiry into whether what is characterized as a gift in fact meets the Duberstein definition of a gift under section 102.  Id. at 286.

The Supreme Court in Duberstein was careful to distinguish a common law gift from a section 102 gift.  A common law gift requires only a voluntarily executed transfer without consideration.  Id. at 285.  So long as the donor had no legal obligation to pay, a transfer is a gift at common law.  A section 102 gift, on the other hand, is more narrowly defined and requires more--it requires detached and disinterested generosity.  Id.  A transfer that proceeds from a moral duty or other expectation does not proceed from detached and disinterested generosity and

**[*9]** is not a section 102 gift. Id. When a donee has rendered services to a donor, a payment for the services is not a gift even if the transferor had no legal compulsion to pay the remuneration. Id.

Viewing the Duberstein standard through the prism of the relevant burdens of proof in this case, the ultimate issue for decision is whether petitioner has persuaded this Court that transfers totaling $24,775,000 constituted gifts from Mr. Haring within the meaning of section 102. See id. at 289. If petitioner cannot, he will have failed to meet his burden with regard to the determinations in the notice of deficiency and, conversely, respondent will have met his burden of proof as to the amounts asserted in his amended answer because there is no dispute as to the receipt of those amounts, only whether they are nontaxable gifts. The intention with which Mr. Haring made the transfers is the most critical factor. See id. at 285. Although the Court granted petitioner's motion in limine to preclude the drawing of any adverse inference from Mr. Haring's absence at trial, the Court also warned the parties on multiple occasions of the importance of hearing Mr. Haring's testimony. The Court's ruling on the motion in no way relieved petitioner of his burden of proving Mr. Haring's intention by a preponderance of credible evidence.

**[*10]** Notwithstanding the Court's warnings, Mr. Haring did not testify. Petitioner instead relies primarily on his own testimony, and that of Mr. Mitchell and Mr. Bernstein, to establish Mr. Haring's intent with respect to the transfers. Our decision hinges on the credibility of these witnesses, to which we now turn.

II.    Credibility

"The most important and most crucial action the courts take in * * * [a trial] is to resolve facts." United States v. Gainey, 380 U.S. 63, 88 (1965) (Black, J., dissenting). The fact-finding process often requires the Court as the fact finder to first evaluate the credibility of witness testimony before making findings on the basis of that testimony. This Court has stated that in determining credibility,

> [w]e observe the candor, sincerity, and demeanor of each witness in order to evaluate his or her testimony and assign it weight for the primary purpose of finding disputed facts. We determine the credibility of each witness, weigh each piece of evidence, draw appropriate inferences, and choose between conflicting inferences in finding the facts of a case. The mere fact that one party presents unopposed testimony on his or her behalf does not necessarily mean that the elicited testimony will result in a finding of fact in that party's favor. We will not accept the testimony of witnesses at face value if we find that the outward appearance of the facts in their totality conveys an impression contrary to the spoken word.

Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 84 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

**[\*11]** As the trier of fact, we may credit evidence in full, in part, or not at all. We may credit that part of a witness' testimony that is not self-serving, while requiring some form of corroboration before crediting the portion that is. See Stein v. Commissioner, 322 F.2d 78 (5th Cir. 1963), aff'g T.C. Memo. 1962-19. For example, in Stein[4] the taxpayer introduced as evidence notebooks in which he entered both his daily net gambling winnings and losses. Id. at 79. The Court of Appeals affirmed our factual findings accepting as credible the entries that showed net winnings, but not those that showed net losses--which were self-serving and not otherwise corroborated. Id. at 82.

"[C]redibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." Harnett v. Commissioner, 496 F. App'x 963, 967 (11th Cir. 2012) (quoting United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002)), aff'g T.C. Memo. 2011-191. In the context of section 102 the fact-finder's role becomes even more critical. The Supreme Court has said that the determination of whether a transfer

---

[4]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions of the U.S. Court of Appeals for the Fifth Circuit handed down before October 1, 1981.

**[*12]** constitutes a gift "must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case." Commissioner v. Duberstein, 363 U.S. at 289. "The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact." Id.; see also Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-574 (1985) (stating that if the trial court's view of the evidence is plausible in the light of the record, a reviewing court may not disturb it absent clear error); United States v. Yellow Cab Co., 338 U.S. 338, 342 (1949) (stating that where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous); United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948) (stating that clear error is an extremely high standard that means the reviewing court is left with the "definite and firm conviction that a mistake has been committed"). It is with this framework in mind that we now turn to petitioner's story.

**[*13]** II.     Petitioner's Story

Petitioner, through his own and his witnesses' testimony, presents a story about his relationship with Mr. Haring to support his contention that the transfers at issue constitute gifts.[5]  We summarize that story below.

A.     Petitioner and David Haring's Business Ventures

In 1992 petitioner sought capital from Bob Shapiro to purchase discounted privately held mortgages.  Mr. Shapiro was the owner of Dunewood Funding (Dunewood), located in Florida.  Mr. Shapiro in turn introduced petitioner to Mr. Haring, who was an investor in Dunewood.  As a result of this introduction, Dunewood hired petitioner to buy privately held mortgages.  Petitioner initially worked as a contractor for Dunewood from his home in New Jersey, but after Dunewood found its footing in the discounted-cashflow industry, petitioner moved to Florida as an employee of Dunewood.

---

[5]As discussed infra pp. 19-20, there is very little in the record to corroborate the story told by petitioner and his witnesses, each of whom had ties to the mysterious Mr. Haring.  Consequently, we summarize the testimony only to explain why we conclude as we do in this opinion.  For the purposes of our analysis, we do not adopt this story as a finding of fact and the elements of the story recited here should not be construed as findings of fact.  Even if we were to assume that the story was sufficiently supported by the record to find either its entirety or parts as facts, however, it would not support a conclusion that the transfers in this case meet the standard for a detached and disinterested gift.  See Commissioner v. Duberstein, 363 U.S. 278 (1960).

[*14] Shortly thereafter, Dunewood experienced financial troubles, which led Mr. Haring to spend two weeks at Dunewood in an attempt to salvage his investment. Petitioner and Mr. Haring spent time working together during this period. Mr. Haring ultimately agreed to provide additional funding to alleviate Dunewood's financial difficulties. Mr. Haring also assigned Mr. Mitchell to work at Dunewood in order to oversee operations and to protect Mr. Haring's capital investment. Petitioner and Mr. Mitchell developed a close relationship during their time together at Dunewood.

After recovering his investment in Dunewood in late 1992, Mr. Haring dissociated himself from the business and Mr. Mitchell left the company. Petitioner and Mr. Haring, however, continued to speak and meet when Mr. Haring was in town. In March 1993 Dunewood ceased operations after suffering additional financial problems.

In the spring of 1993 petitioner and Mr. Haring formed Singer Asset Finance Co. (Singer). Mr. Haring provided the financing for Singer and, in exchange, received an option to acquire a 75% equity interest in the business.[6]

---

[6]We assume that, under petitioner's story, Duncan Property Development, Ltd., Mr. Haring's investment vehicle, at some point exercised its option and acquired a 75% equity stake in Singer.

[*15] Petitioner held the remaining 25% interest in Singer. Singer focused on purchasing lottery winnings paid as annuities.

Petitioner and Mr. Haring operated Singer between 1993 and 1997. During this time petitioner and Mr. Haring purportedly developed a close personal relationship. In 1995 Enhance Financial Services Group (Enhance) purchased from petitioner and Mr. Haring a 50% interest in Singer for an undisclosed amount. In March 1997 Mr. Haring sold his remaining interest in Singer to Enhance for approximately $16 million. In December 1997 petitioner sold his remaining interest in Singer to Enhance for approximately $5.3 million.[7] As part of this transaction petitioner signed a noncompete agreement that prevented him from investing in or working for a company engaged in a business similar to that of Singer for five years.

Beginning in 1995 at Mr. Haring's request, petitioner agreed to act as a nominee for Mr. Haring by establishing and holding various financial interests beneficially owned by Mr. Haring. In 1995 petitioner opened a nominee bank account at Credit Suisse for Mr. Haring. In 2000 petitioner established a trust in

---

[7]After petitioner sold his interest in Singer in 1997, he was unemployed for approximately 2-1/2 years. During this time he met with Mr. Haring for lunch in Nassau, Bahamas. At the lunch Mr. Haring reportedly took an interest in petitioner's personal life.

[*16] Liechtenstein for Mr. Haring called the Waromi Trust. The Waromi Trust was administered by LGT Trust Management Limited. Mr. Mitchell had a power of attorney for the Waromi Trust and the Credit Suisse account. Petitioner was reimbursed for his travel expenses in connection with opening the accounts and establishing the trust for Mr. Haring, but he did not receive any compensation for those services.

In early 2000 petitioner started a credit counseling business called First Mutual Financial (First Mutual). Petitioner operated First Mutual for approximately six to seven years. Although Mr. Haring did not have an ownership interest in First Mutual, he provided a loan facility through Avenger, an entity under his control (Avenger loan). In 2007 petitioner paid off the Avenger loan using some of the funds transferred to him, purportedly as gifts, by Mr. Haring.

In 2000 while petitioner's noncompete agreement was still in force, Mr. Haring, through Skyline Technologies, Ltd. (Skyline), reentered the discounted-cashflow-industry by providing emergency funding and loan guaranties to Settlement Funding, LLC, doing business as Peachtree Settlement Funding (Peachtree). Peachtree's business, like that of Singer, focused on purchasing structured settlements and life insurance settlements. In exchange for the funding and loan guaranties, Mr. Haring acquired an estimated 70% equity stake in

[*17] Peachtree.  When asked at trial whether petitioner had any interest in Peachtree, Mr. Bernstein testified only that petitioner's name did not appear as that of an owner in any of the paperwork for any transactions.

Mr. Haring eventually liquidated his interest in Peachtree for approximately $255 million in a series of transactions.  The first liquidity event came when LLR Partners, Inc., and Greenhill Capital Partners made a private equity investment in Peachtree on February 4, 2005.  In March 2006 Peachtree went public on the London Stock Exchange, providing a second liquidity event for Mr. Haring.  Finally, in November 2006 Credit Suisse acquired Peachtree, resulting in the total liquidation of Mr. Haring's interest in Peachtree.

B.     Mr. Haring's Cash Transfers to Petitioner

Petitioner last saw Mr. Haring in 2002.[8]  In 2005, however, around the time Mr. Haring experienced the first liquidity event with respect to his Peachtree investment, petitioner received a two-to-three-minute phone call from Mr. Haring.  Mr. Haring purportedly informed petitioner that he had a surprise for petitioner and that he needed petitioner's bank information.  Immediately after the phone call petitioner called Mr. Mitchell and the two agreed to meet in person to discuss the

---

[8]Petitioner testified at trial that he did not know where Mr. Haring lives nor did he know Mr. Haring's telephone number.

[*18] details of Mr. Haring's "surprise". During the meeting Mr. Mitchell told petitioner that he would receive a series of gifts that would require petitioner's bank account information to enable wire transfers into petitioner's account.

In order to effect the purported gifts, Mr. Mitchell spoke to Mr. Haring's and petitioner's tax attorney, Mr. Bernstein. Mr. Mitchell and Mr. Bernstein drafted a note to petitioner from Mr. Haring stating that the transfers were gifts.[9] Mr. Mitchell presented the note to Mr. Haring, and Mr. Haring signed it. The note dated January 18, 2005, read:

> Dear Burt,
>
> As 2005 rolls around, I have been reflecting on my life and all things that are meaningful to me. It is apparent to me that true friends are very fleeting and our friendship has endured for quite some time.
>
> I have decided to share some of my wealth during my lifetime so I can see people enjoy themselves rather than wait until after my life has ended. Consistent with this I would like to make you a monetary gift. Can you please send me your transfer details so I can accomplish this.
>
> Your friend,
>
> David

---

[9]Respondent objects to the admission of the note. As discussed infra p. 20, respondent's objection is overruled.

[*19] After petitioner received the note, Mr. Haring began making transfers. Mr. Haring would instruct Mr. Mitchell to transfer various amounts from Mr. Haring's personal account or from the account of Skyline, a company controlled by Mr. Haring, to petitioner and to trusts for petitioner's benefit. Mr. Haring determined the amount and the source of each transfer to petitioner. Before making each transfer, Mr. Mitchell would contact petitioner to obtain his wire transfer details, and petitioner determined the account to which the funds would be transferred. After receiving each transfer petitioner would confirm that he had received it, and Mr. Mitchell would set up a phone call between petitioner and Mr. Haring for petitioner to thank Mr. Haring. After the July 19, 2007, transfer, petitioner was informed that it was the last transfer from Mr. Haring. Petitioner received total transfers of $24.775 million from Mr. Haring.

IV. Analysis

A. Petitioner's Story Is Not Credible or Convincing.

We find petitioner's story unconvincing and the testimony provided by petitioner, Mr. Mitchell, and Mr. Bernstein not credible. Petitioner's testimony was self-serving, and Mr. Mitchell's and Mr. Bernstein's testimony was simply not credible. None of the testimony was supported by credible documentary evidence. Mr. Mitchell, who was Mr. Haring's close associate and petitioner's friend, was

**[\*20]** not a disinterested witness. Similarly, Mr. Bernstein represented both petitioner and Mr. Haring; he can hardly be considered disinterested. We found Mr. Bernstein evasive in his answers and in his selective invocation of the attorney-client privilege with regard to the legal advice provided to Mr. Haring about the transfers. For example, when asked at trial whether petitioner held an interest in Peachtree, Mr. Bernstein merely asserted that petitioner's name as owner did not appear on any documents.

In an attempt to corroborate his story, petitioner sought to introduce a note dated January 18, 2005, that purports to be from Mr. Haring regarding his desire to transfer funds to petitioner as a "gift". Respondent objects to the introduction of this note on hearsay grounds. Rule 803(3) of the Federal Rules of Evidence excludes from the rule against hearsay statements that describe a declarant's then-existing state of mind (such as motive, intent, or plan). Because we find that rule 803(3) applies, we admit the note over respondent's objection.

Even though we admit the note that Mr. Mitchell and Mr. Bernstein prepared for Mr. Haring, we have serious doubts as to its authenticity and credibility.[10] Consequently, we assign it little weight in determining whether the

---

[10]At trial Mr. Bernstein and Mr. Mitchell authenticated Mr. Haring's signature on the note by affirming that they recognized his handwriting.

**[*21]** transfers were objectively gifts.  Mr. Haring did not draft the note.  It was drafted by Mr. Mitchell and Mr. Bernstein, and there are no credible facts in the record to suggest that they knew or accurately represented Mr. Haring's intent or that the transfers came from detached and disinterested generosity.

> B.      Petitioner Has Failed To Prove That the Transfers Were Made With Disinterested Generosity.

Petitioner's story confirms that he and Mr. Haring had a business relationship starting in the early nineties and ending in 2007 with the repayment of the Avenger loan.  As a result of this business relationship, petitioner would have us believe that he and Mr. Haring developed such a close personal relationship that Mr. Haring decided to give petitioner gifts of $24.775 million.  We do not find petitioner's and the witnesses' testimony credible with respect to this close personal relationship.  Petitioner's story is simply insufficient to prove that he and Mr. Haring had anything more than a business relationship where occasionally personal matters were discussed.

Even if we were willing to find that petitioner and Mr. Haring had a close personal relationship, the record is devoid of any credible evidence to prove that Mr. Haring transferred the funds to petitioner with detached and disinterested generosity.  See Commissioner v. Duberstein, 363 U.S. at 285-286.  Additionally,

[*22] when we consider our "experience with the mainsprings of human conduct" and the unconvincing record in this case, we cannot find facts that establish that Mr. Haring and petitioner had the type of relationship that would result in gifts this substantial. See id. at 289.

The timing of the transfers, especially the strong correlation with liquidity events experienced by Mr. Haring as a Peachtree investor, raises a question as to whether Mr. Haring acted as a nominee for an investment by petitioner in Peachtree. On Monday, February 7, 2005, the first liquidity event was reported in a Philadelphia banking and financial services publication. Just a few days earlier, on Friday, February 4, 2005, petitioner received the first transfer of $2.6 million from Mr. Haring. In March 2006 Peachtree went public and in April 2006 petitioner received a $6 million transfer from Mr. Haring. Finally, in November 2006 Credit Suisse acquired Peachtree and in December 2006 petitioner received an $8.75 million transfer from Mr. Haring.

The question of whether Mr. Haring acted as a nominee for petitioner becomes even more compelling when certain aspects of petitioner's story are considered. At the time of the Peachtree investment petitioner was barred by a noncompete agreement from participating or investing directly in Peachtree. Moreover, at the time of Mr. Haring's investment in Peachtree, petitioner held

[*23] assets belonging to Mr. Haring in a nominee account and a nominee trust, suggesting a willingness on their parts to participate in nominee arrangements. We need not answer the question, however; suffice it to say that petitioner failed to meet his burden of proving that the transfers were gifts under section 102.[11] Accordingly, he has failed to meet his burden regarding the determinations in the notice, and respondent has met his burden regarding the increases asserted in his amended answer.

Petitioner cites <u>Bogardus v. Commissioner</u>, 302 U.S. 34 (1937), <u>Runyon v. Commissioner</u>, T.C. Memo. 1984-623, <u>Abdella v. Commissioner</u>, T.C. Memo. 1983-616, and <u>Brimm v. Commissioner</u>, T.C. Memo. 1968-231, to support his position that the transfers from Mr. Haring should be excluded as gifts under section 102. Although the Court in those cases concluded that payments the taxpayer received were gifts, those cases are distinguishable.

---

[11]Additionally, even if we believed parts of petitioner's story, we would view the series of transfers and their abrupt end as odd. Many transfers were made within days of each other. Petitioner repaid a loan from Mr. Haring with the proceeds of the "gifts". If Mr. Haring had truly wished to provide financially for petitioner, why did he not begin by forgiving the outstanding Avenger loan rather than making transfers far exceeding the loan balance and then expecting repayment of the loan? While this may be consistent with Mr. Haring's past behavior, the record is simply devoid of credible evidence for us to draw any conclusions.

[*24] In <u>Bogardus v. Commissioner</u>, 302 U.S. at 38, the parties stipulated that funds the taxpayer received were not intended to be payment or compensation for any services rendered or to be rendered. No such stipulation is present here. In two of the other cases petitioner cites, the donors appeared before the Court and provided credible testimony evincing their donative intent. It was on the basis of the donors' testimony, not present in this case, that the Court found that the transfers in those cases were gifts.[12] In contrast, we did not hear from Mr. Haring, which is surprising given his alleged close relationship with petitioner, and we cannot find other credible evidence in the record to determine his intentions.[13]

---

[12]In <u>Brimm v. Commissioner</u>, T.C. Memo. 1968-231, the donor was a school, and a member of the board of trustees executive committee credibly testified regarding the school's intention. In <u>Abdella v. Commissioner</u>, T.C. Memo. 1983-616, the donors were shareholders of a corporation that employed the taxpayer. The donors told the taxpayer that the payment was a gift to him, but then later claimed a deduction for the payment as compensation. Nonetheless, the donors testified at trial that it was their intent to give the taxpayer a gift because they had sold the corporation, and the Court concluded that the objective facts indicated that the transfer was a gift when made. <u>Id.</u> The donors in <u>Runyon v. Commissioner</u>, T.C. Memo. 1984-623, were the same donors involved in <u>Abdella</u>. While the opinion in <u>Runyon</u> is not clear as to whether the donors testified, the Court relied on its opinion in <u>Abdella</u> in reaching its conclusion.

[13]The Court granted petitioner's motion in limine, <u>see</u> <u>supra</u> p. 9, to preclude the drawing of any adverse inference from Mr. Haring's absence at trial, <u>see</u> <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158 (1946), <u>aff'd</u>, 162 F.2d 513 (10th Cir. 1947). In reaching our conclusion, we draw no adverse inference against petitioner as a result of Mr. Haring's absence. We conclude,

(continued...)

**[\*25]** The record consists largely of unsubstantiated and self-serving testimony that we do not find credible. The record suffers from factual gaps and a noteworthy lack of documentation regarding the story told by petitioner and his witnesses. Because petitioner bears the burden of persuading this Court that the transfers were gifts and not income, and has failed to carry that burden, the deficiencies determined in the notice of deficiency are sustained. Moreover, because petitioner does not dispute the receipt or amount of the 2006 transfer and has failed to prove that it was a gift, respondent has met his burden of proof as to as the increases asserted in his amended answer,[14] which are sustained.

V.      Section 6662 Penalty

Section 6662(a) and (b)(2) imposes a 20% penalty on the portion of an underpayment that is attributable to, among other things, a substantial

---

[13](...continued)
however, that the evidence petitioner presented is insufficient for us to find that Mr. Haring's transfers during the years at issue were gifts. While petitioner could have proved Mr. Haring's intent with indirect, inferential evidence of intent if the evidence was convincing and credible, see Alhadi v. Commissioner, T.C. Memo. 2016-74, the record does not contain sufficient credible evidence for us to conclude that Mr. Haring's transfers were the result of detached and disinterested generosity, see Commissioner v. Duberstein, 363 U.S. at 285.

[14]Petitioner does not dispute the increased December 20, 2006, transfer amount that resulted in the increased deficiency and penalty in respondent's amended answer. See supra p. 7.

**[*26]** understatement of income tax.  The Commissioner bears the burden of production with respect to the taxpayer's liability for the section 6662(a) penalty.  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  Once the Commissioner meets this burden, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect.  See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 447.

Section 6751(b)(1) provides that, subject to certain exceptions not relevant here, no penalty shall be assessed unless the initial determination of such assessment is personally approved in writing by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate.  See Graev v. Commissioner, 149 T.C. 485, 492-493 (2017), supplementing and overruling in part 147 T.C. 460 (2016); see also Clay v. Commissioner, 152 T.C. 223, 249 (2019) (citing section 6751(b)).  In Graev we held that the Commissioner's burden of production under section 7491(c) includes establishing compliance with the supervisory approval requirement of section 6751(b).  In Clay v. Commissioner, 152 T.C. at 249, we held that the initial determination for purposes of section 6751(b) is made no later than when the Commissioner issues a revenue agent's report (RAR) to a taxpayer that proposes

[*27] adjustments including penalties and gives the taxpayer the right to protest those proposed adjustments with the Internal Revenue Service's Appeals Office.[15]

Trial of this case was held, and the record was closed, before we issued our Opinions in Graev, Clay, and Belair Woods, LLC v. Commissioner, 154 T.C. ___, ___ (slip op. at 24-25) (Jan. 6, 2020). In the wake of Graev, we ordered respondent to file a response addressing the effect of section 6751(b) on this case and directing the Court to any evidence of section 6751(b) supervisory approval in the record. Respondent was unable to direct the Court to any evidence in the record that satisfies his burden of production with respect to section 6751(b)(1), so he filed a motion to reopen the record to offer the following evidence: (1) a declaration of Diane M. Acosta, the supervisor who approved the initial determination to propose section 6662(b)(2) accuracy-related penalties in connection with the examination and (2) the Civil Penalty Approval Form for the years at issue, dated October 31, 2012. Petitioners objected to the introduction of any additional evidence with respect to the penalties and requested that the Court

---

[15]Since this Court's Opinion in Clay v. Commissioner, 152 T.C. 223 (2019), was published, this Court in Belair Woods, LLC v. Commissioner, 154 T.C. ___, ___ (slip op. at 24-25) (Jan. 6, 2020), held that "the 'initial determination' of a penalty assessment * * * is embodied in the document by which the Examination Division formally notifies the taxpayer, in writing, that it has completed its work and made an unequivocal decision to assert penalties."

[*28] deny respondent's motion. On August 6, 2018, we granted respondent's motion to reopen the record. The parties engaged in further discovery to develop the record with respect to the written supervisory approval.

While discovery was ongoing, we issued our Opinion in <u>Clay</u>; we then ordered respondent to file a response addressing its effect on this case. Respondent's response attached two letters sent to petitioner. The first was Letter 915, dated August 6, 2012, and the second was Letter 950, dated October 31, 2012. Each letter enclosed either Form 4549 or Form 4549-A proposing accuracy-related penalties, and each letter offered petitioner the opportunity to file a protest of the proposed adjustments with the IRS Appeals Office. The parties filed a supplemental stipulation of facts and attached the Letter 915 and the Letter 950 as exhibits. On April 2, 2020, we issued an order admitting the stipulated exhibits and closing the record in this case.

The debate surrounding section 6751(b) focuses on the Letter 915 and the Letter 950. The penalty approval form in the record was signed after the Letter 915 was delivered to petitioner and before the Letter 950 was mailed to him. If we find that the Letter 915 was the initial determination to assert accuracy-related penalties, then respondent cannot meet his burden of production under section 6751 because the date on which the initial determination was communicated

**[\*29]** would predate the date on which the civil penalty approval form was signed. See, e.g., Clay v. Commissioner, 152 T.C. at 249-250.

Respondent contends that the Letter 915 dated August 6, 2012, cannot be an initial determination because: (1) Clay is inapplicable in that Letter 915 is not the colloquially termed "30-day letter" and (2) the Letter 915 was meant to invite petitioner to submit additional information, at a time when it was understood that petitioner would not yet pursue an administrative appeal. We find these contentions unconvincing. First, Clay v. Commissioner, 152 T.C. at 249, held that a letter offering the taxpayer a right to pursue an administrative appeal and enclosing an RAR that proposed a section 6662 penalty constituted the initial determination within the meaning of section 6751(b).[16] Second, we have

---

[16]Even if we were to adopt respondent's limited reading of Clay, which we do not, the Court in Belair Woods, LLC v. Commissioner, 154 T.C. at ___, (slip op. at 15), noted that the "'initial determination' of a penalty may occur earlier in the administrative process". Specifically, the critical question under Belair Woods is whether a document "embodies" an initial determination because it "formally notifies the taxpayer, in writing, that * * * [the Examination Division] has completed its work and made an unequivocal decision to assert penalties." Id. at __ (slip op. at 24-25). While Clay involved a 30-day letter that included a right to appeal, the right to appeal is not always necessary for a communication to meet the Belair Woods standard. See Carter v. Commissioner, T.C. Memo. 2020-21 (holding that a communication which did not include an appeal right constituted an initial determination). In this case, the Letter 915 did include an appeal right and provided the requisite formal notification. Respondent's subjective intent in sending the Letter 915 is of no moment.

[*30] repeatedly held that the content of a document and not its label is controlling. See Wilson v. Commissioner, 131 T.C. 47 (2008) (holding that a taxpayer is not entitled to judicial review after an equivalent hearing regarding a proposed collection action merely because the Appeals Office mistakenly sent its determination to the taxpayer using the wrong form letter); Craig v. Commissioner, 119 T.C. 252, 263 (2002) ("The form on which a notice of assessment and demand for payment is made is irrelevant as long as it provides the taxpayer with all the information required[.]" (citing Elias v. Connett, 908 F.2d 521, 525 (9th Cir. 1990))). Third, regardless of the subjective intent with which respondent mailed the August 6, 2012, Letter 915, it is indisputable that the letter objectively provided petitioner the right to file a protest with the Appeals Office. Thus, respondent's contentions are unavailing.

We conclude that respondent made his initial determination no later than August 6, 2012, when he delivered the Letter 915, which was the first letter to petitioner proposing the accuracy-related penalties and providing petitioner with the opportunity to file a protest to the adjustments with the Appeals Office. See Clay v. Commissioner, 152 T.C. at 249. Because the initial determination to impose the section 6662 accuracy-related penalties was made no later than August 6, 2012, before the Civil Penalty Approval form was signed on October 31, 2012,

[*31] respondent cannot satisfy his initial burden of production under section

6751(b).  See id.  We, therefore, hold that petitioner is not liable for the accuracy-

related penalties under section 6662(a).[17]

We have considered the parties' remaining arguments, and to the extent not

discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered for

respondent as to the deficiencies and for

petitioner as to the accuracy-related

penalties under section 6662(a).

---

[17]Respondent amended his answer to assert increased penalties for tax year 2006.  Respondent has failed to introduce sufficient evidence demonstrating compliance with his burden of production as to these increases.  See Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. 224, 238 (2018).